**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LEAH ZATUCHNI,** | ) | |
| *By her legal guardian*, | ) | |
| **Plaintiff**, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **No. 07-cv-4600** |
| **ESTELLE RICHMAN,** | ) | |
| *Secretary Pennsylvania Department of Public* | ) | |
| *Welfare, in her official capacity*, **et al.,** | ) | |
| **Defendants**. | ) | |

---

## MEMORANDUM OPINION AND ORDER

**RUFE, J.**                                                                 **August 12, 2008**

Plaintiff seeks relief for injuries allegedly caused by her improper placement in an inadequate intermediate care facility for the mentally retarded under the Medicaid Act, the Americans with Disabilities Act, and the Rehabilitation Act, against various Defendants. Plaintiff also asserts a negligence claim against the admitting facility. Before the Court are three separate Motions to Dismiss, and Plaintiff's respective responses. The Opinion of the Court follows.

## I.       FACTUAL AND PROCEDURAL BACKGROUND

As this matter is before the Court on a motion to dismiss, we recite the facts as alleged in the Amended Complaint and assume they are true for the purpose of this motion.[1] Plaintiff, Leah Zatuchni, is a twenty-two year old woman who suffers from cerebral palsy, mental retardation, a seizure disorder and other ailments. Plaintiff is confined to a wheelchair and is unable to perform physical tasks without assistance. Plaintiff's parents are incapable of providing her with

---

[1] E.g., Rogers v. Am. Can Co., 305 F.2d 297, 318 (3d Cir. 1962).

the care she requires on a full time basis without outside assistance.  Through the Medicaid Act, 42

U.S.C. 1396, the federal government provides funds to states to provide medical assistance to

indigent, elderly, and disabled individuals.  The Medicaid Act authorizes the Secretary of Health and

Human Services ("HHS") to grant waivers to states, upon meeting certain conditions, to provide in-

home and community-based care to individuals who would otherwise require the level of care

provided by a hospital or intermediate care facility, such as Plaintiff requires, which the state  is

responsible to fund.  The Pennsylvania Department of Public Welfare ("DPW") is responsible for

the administration and supervision of services provided to disabled residents in the Commonwealth.

Some services provided by the DPW are funded by the federal government through Medicaid while

others are funded by state revenue.  According to Plaintiff, 42 U.S.C. § 1396n(c)(2)(C) requires the

DPW to inform disabled persons such as Plaintiff, or their legal representative, of feasible

alternatives for her care, and allow them an opportunity to select whether the available services

should be provided at home, in a community based setting, or in an intermediate care facility for

people with mental retardation ("ICF/MR").

Plaintiff attended the HMS School for Children with Cerebral Palsy ("HMS"), until

she graduated in June of 2006.  She resided at HMS from Monday through Friday and received

therapy and care there during her tenure as a student, while also receiving additional services from

the Commonwealth.  During this time, Plaintiff would return home to be cared for by her parents

every weekend.  Each year that Plaintiff attended HMS, an Individual Education Program ("IEP")

was prepared by a team involved in Plaintiff's education and care, including Plaintiff, her parents,

representatives from HMS, the Lower Merion School District, the Montgomery County Mental

Health/Mental Retardation/Drug & Alcohol/Behavioral Health Department ("Montco Health

Department"), and Ken-Crest, the agency designated by the Commonwealth to provide services to Plaintiff. The IEP prepared for the 2004-2005 school year reflects that the Mary Campbell Center was an appropriate placement for Plaintiff upon her graduation from HMS in June 2006, and also shows that Plaintiff's parents were investigating a day program at an ICF/MR named Melmark, Inc. ("Melmark").

Between 2005 and 2006, Plaintiff's parents repeatedly requested to meet with the appropriate members of the Montco Health Department to arrange Plaintiff's transition to the Mary Campbell Center after her graduation from HMS. In December 2005, the Montco Health Department approved Plaintiff's Individual Support Plan ("ISP"), which concluded that after graduation, Plaintiff should live in a residential facility that had a meaningful daily routine but would also allow her to spend time with her family. The IEP team intended for these same goals to be accomplished during the interim period between her graduation from HMS and her admission to an ICF/MR, by having her attend Melmark's day program, continue to receive therapy from HMS, and continue to receive the required habilitation support services from Ken-Crest. Plaintiff's ISP does not recommend a particular residential facility, but it reflects that the Mary Campbell Center was an appropriate facility for her. The ISP recommends that Plaintiff's support coordinator, Defendant Markita Barker ("Barker"), assist Plaintiff's family in locating an appropriate day program, navigating the intake process, and arranging transportation to the selected facility. Plaintiff's parents arranged for her to be evaluated by the Mary Campbell Center, which ultimately found her acceptable for admission.

In February or March of 2006, Plaintiff's parents met with Defendant Karen Kenny, the support coordinator supervisor of the Montco Health Department's mental retardation program,

as well as representatives of Ken-Crest, in an effort to begin the admissions process for Plaintiff at the Mary Campbell Center and to arrange for the services recommended by Plaintiff's support team for the interim period after her graduation.  At this meeting, Plaintiff alleges that, at the direction of Defendant Eric Goldstein, Administrator of the Montco Health Department, and Defendant Marguerite Peashock, director of the Montco Health Department's mental retardation program, Defendant Kenny informed Plaintiff's parents that they would not place Plaintiff in the Mary Campbell Center because it is located outside of Pennsylvania, in Delaware.  At this same meeting, Ken-Crest informed Plaintiff's parents that it was not able to provide Plaintiff with the support services she required after her graduation from HMS.  At the conclusion of the meeting, Plaintiff's parents were provided with a list of all licensed nursing homes in Pennsylvania and told to select the one for Plaintiff's placement after her graduation.

Plaintiff alleges that neither Melmark nor any other ICF/MRs located within a reasonable distance from her domicile are able to provide the medical and supplementary services she requires more readily than the Mary Campbell Center.  Plaintiff alleges that neither the Montco Health Department nor the DPW consulted medical advice as to whether the services Plaintiff requires are more readily available at the Mary Campbell Center than at any other facility in Pennsylvania before she was admitted to Melmark.  In addition, after the aforementioned meeting in early 2006, Defendant Barker advised Plaintiff's parents, at the direction of Defendants Goldstein and Peashock, that the Montco Health Department would not provide transportation for Plaintiff to and from Melmark.  In or around May 2006, the Montco Health Department advised Plaintiff's parents that it agreed to Plaintiff's placement at Melmark, and Plaintiff's parents consented, seeing it as their only viable option at the time.  Plaintiff's parents' request that she spend time at Melmark

4

to evaluate the program before her admission was not honored, and Plaintiff was admitted to Melmark in August 2006.  The Montco Health Department cancelled Plaintiff's enrollment in and eligibility for the state services she previously received as of August 31, 2006.

Prior to Plaintiff's admission to Melmark, neither the DPW nor the Montco Health Department informed her or her legal representative of feasible alternatives to Melmark, despite their repeated requests.  Plaintiff alleges that neither Plaintiff nor her legal representative was provided the opportunity to choose whether she wished to receive services in home, at a community based setting or at an ICF/MR.  Plaintiff alleges that since her admission to Melmark, she has not received the therapy and support identified in the December 2005 ISP as necessary to maintain the skills she acquired prior to her admission there.  As a result, Plaintiff's ability to use her hands and arms, operate her wheelchair and use an augmentative communication device, among other skills, have diminished substantially and permanently.  Plaintiff alleges that without the appropriate therapy and support, which Melmark is unwilling or unable to provide, Plaintiff will continue to suffer ongoing and permanent deterioration of her skills and quality of life.

Defendants Thomas Ellis, James Matthews and Ruth Damsker, comprise the Board of Commissioners of Montgomery County, Pennsylvania (collectively "Board" or "Board Members").  Plaintiff alleges that the Board is liable for the wrongdoing of the Montco Health Department as they comprise the legislative and executive arm of Montgomery County.  Plaintiff further alleges that the Board failed to adequately train Defendants Goldstein, Peashock, Kenny and Barker regarding the mandates imposed on them by federal and state law as to the rights of individuals such as Plaintiff.

Plaintiff initiated this lawsuit in November 2007, seeking relief under 42 U.S.C. §

1983, the Medicaid Act, the Americans with Disabilities Act ("ADA"),[2] the Rehabilitation Act ("RA"),[3] and asserting a claim of negligence.  Count I the Complaint alleges violation of 42 U.S.C. § 1396n(c)(2)(C) against the DPW and the Board, seeking enforcement via 42 U.S.C. § 1983.  Count II also alleges violation of § 1396n(c)(2)(C), this time against the Board and Defendants Goldstein, Peashock, Kenny and Barker, and also seeks enforcement under § 1983.  Count III alleges violation of the ADA and the RA, as well as two regulations promulgated thereunder, against the DPW and the Board.  Count IV asserts a claim of negligence against Melmark.  Defendants Ellis, Matthews, Damsker, Goldstein, Peashock, Kenny and Barker filed a Partial Motion to Dismiss Plaintiff's Complaint as it pertains to the Board; Defendant Melmark filed its own Motion to Dismiss; and Defendant Richman filed a separate Motion to Dismiss as well.  The Court will address Defendants' Motions in turn.

## II.    DISCUSSION

### A.  Legal Standard for Rule 12(b)(6) Motion to Dismiss

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all allegations in the complaint, draw all reasonable inferences therefrom, and view them in the light most favorable to the plaintiff.[4]  The United States Supreme Court has recently clarified this standard of review, explaining that "[a] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do" without the allegation of

---

[2] 42 U.S.C. § 12131 et seq.

[3] 29 U.S.C. § 794.

[4] Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989).

6

sufficient facts in support.[5]  In order to survive a motion to dismiss, a plaintiff must allege facts that

"raise a right to relief above the speculative level, on the assumption that all the allegations in the

complaint are true (even if doubtful in fact)."[6]  A court may grant a 12(b)(6) motion only "if it appears

to a certainty that no relief could be granted under any set of facts which could be proved."[7]

### B.      The Board's Motion to Dismiss

Defendants Ellis, Matthews, Damsker, Goldstein, Peashock, Kenny and Barker are all

representatives of Montgomery County, Pennsylvania, and named as the moving parties in the title

of their Motion to Dismiss.  Upon review of this Motion and Plaintiff's Response, however, these

Defendants assert arguments for the Dismissal of only the three Board Members – Defendants Ellis,

Matthews and Damsker – without any mention of Defendants Goldstein, Peashock, Kenny and

Barker.  Therefore, the Court construes this Motion as asserted on behalf of the Board Members only,

and this Opinion will not alter the posture of Defendants Goldstein, Peashock, Kenny and Barker in

this matter.

### 1.      Liability Under § 1983

In Counts I and II of the Complaint, Plaintiff seeks relief from the Board under 42

U.S.C. § 1983  for the Montco Health Department's failure to inform Plaintiff of feasible choices for

her care, and for the resultant failure to allow her to choose the services she would receive, in

violation of 42 U.S.C. § 1396(c)(2)(C) (Count I), and also for their failure to train the members of the

Montco Health Department (Count II).  Plaintiff asserts Counts I and II against the Board in both their

---

[5] Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007) (internal citations omitted).

[6] Id. (internal citations omitted).

[7] D.P. Enter. Inc. v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984).

individual and official capacities.  The Board argues that Plaintiff has failed to allege a cause of action against them under § 1983 because the Complaint makes no mention of any personal involvement they had in causing Plaintiff's alleged injuries.  It is well settled that a suit against an individual in his or her official capacity "generally represent[s] . . . another way of pleading an action against an entity of which the officer is an agent."[8]  As Plaintiff has not named Montgomery County – the municipality that the Board members are agents of – as a Defendant, we will construe the claims against the Board in their official capacities as asserted against Montgomery County.

In response to the Board's Motion, Plaintiff argues that the Complaint states a claim against the Board members in their official capacity, and that they are ultimately responsible for Plaintiff's injuries because they represent the executive authority or executive arm of Montgomery County.  Plaintiff points to the Supreme Court's decision in City of Canton v. Harris[9] to show that a municipality or an official could be liable under a § 1983 claim for failing to train its employees as a result of deliberate indifference to the rights of its inhabitants.[10]  In City of Canton, the Supreme Court clarified the analysis for when § 1983 liability attaches to a municipality, or in this case, an official representative of a municipality, under the "failure to train" theory.[11]  City of Canton held that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be thought of as a

---

[8] Kentucky v. Graham, 473 U.S. 159, 165 (1985) (quoting Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978)).

[9] 489 U.S. 378 (1989).

[10] Generally, municipalities cannot be sued under § 1983, but the "failure to train" theory, as explained in City of Canton, falls within the narrow set of circumstances under which municipalities can be sued under § 1983, as established by Monell, 436 U.S. at 694.

[11] Id. at 388.

'policy or custom' that is actionable under § 1983."[12]

Plaintiff's Complaint alleges that the Board Members should be held responsible for the Montco Health Department's alleged violation of 42 U.S.C. § 1396n(c)(2)(C) in Count I, and that the Board was deliberately indifferent to the rights of persons such as Plaintiff in failing to adequately train the representatives of the Montco Health Department named as Defendants to this suit, in Count II.   In City of Canton, the Supreme Court implied that the issue of whether a municipality failed to adequately train its employees thereby causing Plaintiff's injuries, involves a question of fact.[13] Whether or not Plaintiff will be able to support her claims against Montgomery County with facts that show a pattern of constitutional violations or a failure to train employees regarding their legal obligations on the part of Montgomery County cannot be determined at this juncture, and can only be properly addressed after discovery.   Therefore, we find that Plaintiff has plead § 1983 claims against the Board in their official capacity in Counts I and II of the Complaint sufficient to survive Defendant's Motion to Dismiss.

With respect to the claims against the Board Members in their individual capacities, a defendant can be liable for a civil rights violation under § 1983 only if he or she "subjects, or causes to be subjected," the plaintiff to the deprivation of rights alleged.[14]   "A fundamental requirement of a cause of action under 42 U.S.C. § 1983 is that injuries be personally caused by the defendant."[15]

---

[12] Id. at 389.

[13] Id. at 392 ("Predicting how a hypothetically well-trained officer would have acted under the circumstances may not be an easy task for the factfinder . . . [b]ut judge and jury, doing their respective jobs, will be adequate to the task.").

[14] 42 U.S.C. § 1983.

[15] Stratton v. Mash, 71 F. Supp. 2d 475, 476 (E.D. Pa. 1999) (citing City of Canton, 489 U.S. at 389).

As the Board asserts, the Complaint does not allege any facts relating to any of the Board Members' individual involvement in causing her harm, aside from their alleged failure to train Defendants Goldstein, Peashock, Kenny and Barker.  Specifically, the Complaint alleges that the Commissioners are liable for the actions of the Montco Health Department in that they "failed to provide adequate training for Defendants Goldstein, Peashock, Kenny and Barker as to the mandates imposed by both federal and state law as to the rights of individuals such as Leah . . . and were deliberately indifferent to the treatment of individuals such as Leah by the staff of [Melmark]."[16]  Plaintiff's response to the Board's Motion implies that sufficiently specific facts to uphold Counts I and II can be inferred from the allegations in the Complaint as it is now.  We disagree.  Drawing all reasonable inferences from the facts alleged in the Complaint and viewing them in the light most favorable to Plaintiff, we find her allegation that the Board failed to properly train members of the Montco Health Department insufficient to establish a § 1983 cause of action against the Board Members in their individual capacities.  Therefore, we will grant the Motion to Dismiss Counts I and II of the Complaint as asserted against the Board Members in their individual capacities.

    2.      Individual Liability Under the ADA and the RA

Count III of the Complaint alleges that the conduct of the Board, as described above, violated Title II of the ADA as well as § 504 of the Rehabilitation Act.  More specifically, Plaintiff asserts that the ADA and the RA require Defendants to provide services in the most integrated setting appropriate to the needs of the qualified individual.  The Board argues that Count III of the Complaint should be dismissed as it relates to them in their individual capacities, because individual liability under both of these statutes is barred as a matter of law.  We address these two statutes in turn.

---

[16] Compl. ¶ 62.

10

a.      Title II of the ADA

In support of its Motion to Dismiss Count III, the Board cites a long line of cases holding that there is no individual liability for the violation of Title II of the ADA.  The Third Circuit has in fact agreed with other circuits holding that Title II of the ADA is not enforceable against individuals.[17]  Additionally, numerous cases in this district have held that there is no individual liability under Title II.[18]  One of the cases cited by the Board in support of their argument is the recent Eastern District of Pennsylvania case of <u>Taylor v. Altoona School District</u>, which cites over thirty cases from within and outside of this Circuit holding that "there is no individual liability under Title II."[19]  Therefore, it is well established that no individual liability is available under Title II of the ADA as a matter of law.

Plaintiff's two-sentence argument in response to the Commissioner's Motion fails to rebut this legal principle, and  simply regurgitates her allegation that "[b]y denying Leah the right to choose whether to receive services in a community based setting, the Defendant [Board Members] have denied Leah the right to receive services in the most integrated setting as required by the ADA and the RA," concluding with the bald assertion that "[a]s in Count I, Leah has stated a claim against the Defendant [Board]."[20]  Neither the facts alleged in Plaintiff's Complaint nor her argument in response to the Board's Motion provide any reason for this Court to contradict the consensus of this

---

[17] <u>See</u> <u>Emerson v. Thiel College</u>, 296 F.3d 184, 189 (3d Cir. 2002) (citing <u>Garcia v. S.U.N.Y. Health Scis. Ctr.</u>, 280 F.3d 98, 107 (2d Cir. 2001) ("Insofar as Garcia is suing the individual defendants in their individual capacities, neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials.")).

[18] <u>E.g.</u>, <u>Taylor v. Altoona Sch. Dist.</u>, 513 F. Supp. 2d 540, 559-60 (E.D. Pa. 2007); <u>Wesley v. Vaughn</u>, Nos. 99-1228/1229, 2003 WL 1493375, at *4 (E.D. Pa. March 19, 2003).

[19] 513 F. Supp. 2d at 559-60.

[20] Pl.'s Resp. to Mot. to Dismiss, at 8-9.

11

Court and others, holding that no individual liability exists under Title II of the ADA. Therefore, we will dismiss Plaintiff's ADA Title II claims as alleged against the Board Members in their individual capacities.

> b.       Section 504 of the Rehabilitation Act

In further support of their argument for dismissal of Count III of the Complaint, the Board also asserts that the Third Circuit has stated that individual liability is not available under the Rehabilitation Act. The Third Circuit has held that "[s]uits may be brought pursuant to Section 504 against recipients of federal financial assistance, but not against individuals."[21] In this case, the DPW, and arguably the Montco Health Department by way of the DPW, are the recipients of federal funds through Medicaid, not through the Board Members themselves. Therefore, following settled Third Circuit precedent, we must dismiss Plaintiff's RA § 504 claims against the Board Members in their individual capacities.

**C.      Defendant Melmark's Motion to Dismiss**

Melmark argues that it should be dismissed from this action because Plaintiff has failed to state a claim against it pursuant to Federal Rule of Civil Procedure 12(b)(6). Specifically, Melmark asserts that the Pennsylvania Mental Health Procedures Act ("MHPA")[22] provides immunity from civil and criminal liability for those persons and institutions engaged in the treatment of the mentally ill. Section 7114 of the MHPA states:

> In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who

---

[21] A.W. v. Jersey City Pub. Sch., 486 F.3d 791, 804 (3d Cir. 2007) (citing Emerson v. Thiel Coll., 296 F.3d 184, 190 (3d Cir. 2002)).

[22] 50 P.S. § 7101 et seq.

participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced . . . or who denies an application for voluntary treatment or for involuntary emergency examination and treatment, shall not be civilly or criminally liable for such decision or for any of its consequences.[23]

The Pennsylvania Supreme Court has made clear that although the text of the MHPA speaks of "persons," it applies to both individuals and institutions who provide treatment to the mentally ill.[24] Melmark further asserts that Plaintiff's Complaint does not allege gross negligence, so the MHPA acts as a bar to this cause of action against it.

Plaintiff argues in response that the MHPA does not provide immunity to Melmark, or any other Defendants in this case, because it only applies to persons and institutions who care for the mentally ill, not the mentally retarded.  Section 7102 of the MHPA states, in pertinent part: "Persons who are mentally retarded . . . shall receive mental health treatment only if they are also diagnosed as mentally ill, but these conditions of themselves shall not be deemed to constitute mental illness."[25]  State courts in Pennsylvania interpreting the MHPA have held that it does not apply to a mentally retarded person unless they are also mentally ill.[26]  The Complaint alleges that Plaintiff is mentally retarded without any mention of mental illness, and Melmark's pleadings do not discuss Plaintiff's mental illness status.

The pleadings do not allege that Plaintiff suffers from mental illness, nor that her

---

[23] Id. § 7114.

[24] Farago v. Sacred Heart Gen. Hosp., 562 A.2d 300, 303 (Pa. 1989) ("Unquestionably, the clear intent of the General Assembly in enacting Section [7]114 of the MHPA was to provide limited civil and criminal immunity to those individuals and institutions charged with providing treatment to the mentally ill.").

[25] MHPA § 7102.

[26] E.g., In re M.J.S., 480 A.2d 349, 351 n.7 (Pa. Commw. Ct. 1984).

placement at Melmark was through commitment pursuant to the MHPA. It is inappropriate as well as impossible for the Court to determine whether Plaintiff is both mentally ill and mentally retarded from the limited information before it, thus, we will refrain from disposing of Plaintiff's cause of action against Melmark at this juncture. Therefore, Melmark's Motion to Dismiss will be denied.

**D.    Defendant Richman's Motion to Dismiss**

1.    Enforceable Rights Under 42 U.S.C. § 1396n(c)(2)(C)

Defendant Richman argues that Count I of Plaintiff's Complaint should be dismissed as a matter of law because 42 U.S.C. § 1396n(c)(2)(C) does not confer an enforceable right. Plaintiff argues in opposition that § 1396n(c)(2)(C) creates rights enforceable via § 1983 because it passes the test enumerated by the Supreme Court in <u>Blessing v. Freestone</u>,[27] Congress used "rights-creating terms" in drafting this provision, and the Third Circuit case of <u>Sabree v. Richman</u>[28] and the Ninth Circuit case of <u>Ball v. Rodgers</u>[29] support this conclusion. The parties agree that § 1396n(c)(2)(C) does not contain a private right of action, leaving the question before the Court whether this provision creates rights enforceable under § 1983.

Whether § 1396n(c)(2)(C) confers an enforceable right is an unsettled question of law that has yielded different results from courts in different circuits.[30] In <u>Sabree</u>, the Third Circuit held

---

[27] 520 U.S. 329 (1997).

[28] 367 F.3d 180 (3d Cir. 2004).

[29] 492 F.3d 1094 (9th Cir. 2007).

[30] <u>See</u> <u>Ball v. Rodgers</u>, 492 F.3d 1094 (9th Cir. 2007) (holding that 42 U.S.C. § 1396n(c)(2)(C) confers an individual right enforceable by way of § 1983); <u>Michelle P. ex rel. Deisenroth v. Holsinger</u>, 356 F. Supp. 2d 763, 769 (E.D. Ky. 2005) (same); <u>Masterman v. Goodno</u>, No. 03-2939, 2004 WL 51271, at *10 (D. Minn. Jan. 8, 2004) (summarily holding that § 1396n(c)(2)(C) contains sufficient "rights creating" language allow an enforcement action under § 1983); <u>M.A.C. v. Betit</u>, 284 F. Supp. 2d 1298, 1307 (D. Utah 2003) (holding that § 1396n(c)(2)(C) does not confer an individual right enforceable under § 1983); <u>Delong v. Houston</u>, No. 00-4332, 2000 WL 1689077, at *5 (E.D. Pa. Oct. 26, 2000) (denying defendant's motion to dismiss arguing that § 1396n(c)(2)(C) does not confer an

that three sections of the Medicaid Act independent of the provision at issue here, namely 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10), and 1396d(a)(15), did create individually enforceable rights.  As Sabree is the most analogous decision in the Third Circuit Court of Appeals, we will employ the analysis used therein to determine whether this provision creates any specific, individually enforceable rights.

In Sabree, the court applied a three step analysis to determine whether the provisions of the Medicaid Act at issue in that case confer rights enforceable under § 1983.  The court examined: (1) the Supreme Court case of Gonzaga University v. Doe[31] to determine the essential characteristics of an "unambiguously conferred right"; (2) whether the statutory text and structure of the provision in question imparts an unambiguously conferred right; and (3) if an enforceable right has been unambiguously conferred, whether Congress has precluded individual enforcement of that right.

In its first step, the Sabree Court assessed Gonzaga University in great depth to determine what statutory language is necessary to unambiguously confer rights by first examining Supreme Court precedent addressing statutory actions brought under § 1983, then by considering what the Court meant in requiring "rights-creating language."  The line of cases examined in Sabree culminated in the decision of Blessing v. Freestone.[32]  In Blessing, the Supreme Court drew on its

---

enforceable right, but refraining from rendering an opinion as to whether § 1396n(c)(2)(C) is enforceable); Cramer v. Chiles, 33 F. Supp. 2d 1342, 1351 (S.D. Fla. 1999) (holding that § 1396n(c)(2)(C) confers an individual right enforceable under § 1983).

[31] 367 F.3d 180 (3d Cir. 2004).

[32] In Sabree, the court examined Wright v. Roanoke Redevelopment & Hous. Auth., 479 U.S. 418 (1987) (permitting a § 1983 suit by tenants to recover past overcharges under a rent-ceiling provision of the Public Housing Act); Wilder v. Va. Hosp. Ass'n, 496 U.S. 498 (1990) (allowing a § 1983 suit brought by health care providers to enforce a reimbursement provision of Title XIX of the Social Security Act); Suter v. Artist M., 503 U.S. 347 (1992) (foreclosing a § 1983 action brought by a class of parents and children who sought to enforce provisions of the Adoption Assistance and Child Welfare Act); and Blessing v. Freestone, 520 U.S. 329 (1997) (holding that plaintiffs failed to assert specific rights under Title IV-D of the Social Security Act, and remanding for a determination of whether specific provisions of Title VI-D give rise to individual rights).

previous reasoning from <u>Wright</u>, <u>Wilder</u>, and <u>Suter</u> and formulated three factors to guide judicial inquiry into whether or not a statute confers enforceable individual rights, commonly referred to as the <u>Blessing</u> Test: (1) Congress must have intended that the provision in question benefit the plaintiff; (2) the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial resources; and (3) the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.[33]  We agree with Plaintiff that § 1396n(c)(2)(C) passes the  <u>Blessing</u> test here, where: (1) it is apparent that Congress intended this provision to ultimately benefit individuals likely to require the level of care provided in a hospital, nursing facility, or ICF/MR, such as Plaintiff; (2) the rights to be informed of feasible alternatives for their care and to choose the type of available services they will receive, are clearly delineated by the provision, and are not "vague or amorphous"; and (3) the provision is couched in mandatory terms, stating "[a] waiver shall not be granted under this subsection unless . . . ."  After satisfying the <u>Blessing</u> test, as the court proceeded in <u>Sabree</u>, our inquiry now turns to whether Congress used "rights-creating language," pursuant to <u>Gonzaga University</u>.

In <u>Gonzaga University</u>, the Court held that Congress must use "rights-creating language" in order to create an enforceable individual right in a statute.[34]  The Court explained that such language must clearly impart an "individual entitlement," and have an "unmistakable focus on the benefitted class."[35]  The <u>Gonzaga University</u> Court next demonstrated the type of "rights-creating

---

[33] 529 U.S. at 340-41.

[34] 536 U.S. at 287.

[35] <u>Id.</u> (quoting <u>Blessing</u>, 520 U.S. at 343; <u>Cannon v. Univ. of Chicago</u>, 441 U.S. 677, 690-93 (1979)).

terms" that unambiguously confer enforceable rights by looking to its implied right of action cases.[36] To exemplify "rights-creating language," the Court looked to the language of Title VI of the Civil Rights Act of 1964, stating that "*No person* in the United States *shall* . . . be subjected to discrimination under any program or activity receiving Federal financial assistance" on the basis of race, color or national origin, and Title IX of the Education Amendments of 1972, stating "*No person* in the United States *shall*, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance."[37]  Comparing the language of the statute at issue in Gonzaga University, the Family Educational Rights and Privacy Act of 1974 ("FERPA"), to the  rights-creating language used in Title VI and Title IX, the Court found that FERPA's provisions, stating "no funds shall be made available" to any "educational agency or institution" which has a prohibited "policy or practice," were in stark contrast to Title VI and Title IX.[38]  Gonzaga University found that the specific mandatory, individually focused language of Titles VI and IX confer individual rights, while the programmatic, aggregate focus of FERPA's language merely creates law applicable to the sates.

Next, we compare the language of 42 U.S.C. § 1396n(c)(2)(C) to Title VI, Title IX, and FERPA, to determine whether Congress used "rights-creating language."  Referred to as one of the Medicaid Act's "free choice provisions,"[39] § 1396n(c)(2)(C)  states, in pertinent part,

A waiver shall not be granted under this subsection unless the State provides

---

[36] Id. at 283-84 ("[O]ur implied right of action cases should guide the determination of whether a statute confers rights enforceable under § 1983.")

[37] Id. at 284 n.3 (quoting 42 U.S.C. § 2000d (emphasis added); 20 U.S.C. § 1681(a) (emphasis added)).

[38] Id. at 283.

[39] See, e.g., Ball, 492 F.3d at 1098.

> assurances satisfactory to the Secretary that such individuals who are determined to
> be likely to require the level of care provided in a hospital, nursing facility, or
> intermediate care facility for the mentally retarded are informed of the feasible
> alternatives . . . at the choice of such individuals . . . to the provision of . . . services
> in an intermediate care facility for the mentally retarded.

This language exhibits both the individually focused terminology of titles VI and IX and regulatory language analogous to FERPA's provisions.  Although § 1396n(c)(2)(C) speaks to the Secretary of HHS, directing that "[a] waiver shall not be granted . . . unless the State provides assurances satisfactory to the Secretary . . ." that it has complied with the terms of this provision, it is distinguishable from FERPA's language "speak[ing] only to the Secretary of Education, directing that 'no funds shall be made available' to any 'educational agency or institution' which has a prohibited 'policy or practice.'"[40]  In <u>Gonzaga University</u>, the Court found that Congress did not use "rights-creating language" because FERPA spoke *only* to the Secretary of Education and did not contain terms focused on individuals that Congress intended that act to benefit.  That is not the case here.

Determining whether Congress used "rights-creating language" when drafting § 1396a(a)(8), the <u>Sabree</u> Court found that in requiring states that accept Medicaid funding to provide ICF/MR services with reasonable promptness, Congress conferred specific entitlements on individuals "in terms that could not be clearer."[41]  Specifically, § 1396a(a)(8) provides, in pertinent part, "[a] State plan for medical assistance must . . . provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals . . . ."  Particularly relevant to the Third Circuit finding "rights-creating terms" in <u>Sabree</u> was that the terms of the

---

[40] <u>Id.</u> at 287 (quoting FERPA, 20 U.S.C. § 1232g(b)(1)).

[41] 367 F.3d at 190 (quoting <u>Gonzaga Univ.</u>, 536 U.S. at 280).

statutory provisions at issue were "mandatory rather than precatory," they had an "individual focus" on "all eligible individuals," and even though they inform the state of its compliance requirements, the terms do not focus on the "entity regulated rather than the individuals protected."[42]  The free choice provision at issue here is likewise mandatory in stating "[a] waiver shall not be granted . . . unless . . . ."; it has a particularized focus on "such individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded"; and although it informs the state of its compliance requirements, the text of § 1396n(c)(2)(C) does not focus solely on the state, but also on the individuals it protects.  The Court notes that  "[s]tatutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'"[43] The free choice provision of the Medicaid Act does not focus on the person or entity regulated *rather* than the individuals protected, it simply speaks to both entities, just as the reasonable promptness provisions do.

Just as Sabree held that the specific entitlements conferred by the reasonable promptness provisions could not be clearer, we find that the specific entitlements conferred by the free choice provision – to be informed of feasible health care options and to choose from those options – could not be clearer.   Viewing the terms of § 1396n(c)(2)(C) next to Title VI, Title IX, FERPA, and Medicaid's reasonable promptness provisions, through the lense of Gonzaga University, we find that Congress did use "rights-creating language" sufficient to unambiguously confer individually enforceable rights.

---

[42] Id. at 190.

[43] Gonzaga Univ., 536 U.S. at 287 (quoting Alexander, 532 U.S. at 289).

Similar to our findings here, United States Courts of Appeals outside of this circuit have held that § 1396n(c)(2)(C), and other sections of the Medicaid Act with similar language, confer rights enforceable under § 1983.  In Ball v. Rodgers, the Ninth Circuit found that  § 1396n(c)(2)(C) does confer the individual enforceable right to be informed of alternatives to traditional institutional care and the right to choose among those alternatives.[44]  The Ninth Circuit examined the language of this provision and found that it is phrased in terms of the persons benefitted, focusing on the use of the word "individuals" not simply in passing, but to specifically describe the class of persons the statute is meant to benefit.[45]  The Ball Court further reasoned that the language of § 1396n(c)(2)(C) is "concerned with whether the needs of any particular person have been satisfied," not solely with an aggregate "institutional policy and practice."[46]  Similarly, in the case of Harris v. Olszewski, also construing the Medicaid Act, the Sixth Circuit held that "[o]ne section (§ 1396a(a)(23)) creates an individual statutory entitlement, namely freedom of choice; the other (§ 1396n) creates exceptions to that right."[47]  Refraining from unilateral adoption of this interpretation of the Medicaid Act, we simply find that under the Sixth Circuit analysis, we read nothing in § 1396n to preclude the right to choose the services a person will receive, regardless of whether that right is initially conferred by § 1396a or § 1396n.

Consistent with the Ninth Circuit's holding in Ball[48] and the Sixth Circuit's analysis

---

[44] 492 F.3d 1094, 1107 (9th Cir. 2007).

[45] Id.

[46] Id. (quoting Gonzaga Univ., 536 U.S. at 288).

[47] 442 F.3d 456, 464 (6th Cir. 2006).

[48] While this Court has not adopted the analysis employed by the Ninth Circuit in Ball, we ultimately reach the same conclusion, that § 1396n(c)(2)(C) does confer individual rights enforceable under § 1983.

20

in <u>Harris</u>, we find that, in drafting § 1396n(c)(2)(C), Congress used "rights-creating language" to unambiguously confer the individual right to be informed of feasible alternatives of care and the right to choose from those alternatives.  Therefore, § 1396n(c)(2)(C) passes the first and second steps of the <u>Sabree</u> analysis, as it easily passed the <u>Blessing</u> test, as Congress used "rights-creating language" in drafting this provision, and the statutory text and structure impart an unambiguously conferred right to the specific class of individuals the provision is intended to protect.

The third and last step in <u>Sabree</u> assessed whether Congress either expressly or by providing a comprehensive remedial scheme, intended to preclude individual suits under the statute at issue.  Once it has been established that an enforceable right has conferred, the burden is on the defendant to rebut the presumption of an enforceable right under § 1983.[49]  Defendant Richman has not satisfied her burden here, as she fails to argue that Congress precluded individual enforcement of the rights conferred by § 1396n(c)(2)(C) in any way.  On the Court's independent assessment of the Medicaid Act, we find no evidence of congressional intent to preclude enforcement of the rights created by § 1396n(c)(2)(C) as this provision contains no express terms to that effect and no comprehensive remedial scheme.

Additionally, the language of § 1396n(c)(2)(C), allowing the federal government to withhold federal funds to states that fail to comply with its mandates, does not negate private enforcement of this provision.  In <u>Wilder</u>, the Supreme Court held that although the Medicaid Act "authorizes the Secretary to . . . curtail federal funds to States whose plans are not in compliance with the Act, . . . [t]his administrative scheme cannot be considered sufficiently comprehensive to

---

[49] <u>Sabree</u>, 367 F.3d at 193.

demonstrate a congressional intent to withdraw the private remedy of § 1983."[50]  Lastly, in Harris, the Sixth Circuit cited Wilder in finding "[t]hat the Federal Government may withhold federal funds to non-complying States is not inconsistent with private enforcement [of the Medicaid Act]."[51] Therefore, we find that the language in § 1396n(c)(2)(C) focusing on regulating the state does not reflect congressional intent to preclude individual suits under the Medicaid Act, and specifically, under § 1396n(c)(2)(C).

Having satisfied the three-step analysis used in Sabree, our review ends here.  The Court faces this decision in early stages of the litigation, recognizing that this is a difficult issue that may very well be given different interpretation by other district courts or courts of appeals. Nevertheless, it is clear enough that Congress intended to create individual rights in drafting § 1396n(c)(2)(C), and that Plaintiff falls squarely within the zone of interest this provision is meant to protect as she requires the level of care provided in an ICF/MR.  Therefore, we will deny Defendant Richman's Motion to Dismiss Counts I and II of the Complaint.

2.      28 C.F.R.§§ 35.130(d) & 41.51(d)

Count III of the Complaint seeks to assert a private right of action for violation of Title II of the ADA,  § 504 of the RA, and their respective implementing regulations 28 C.F.R.§§ 35.130(d) & 41.51(d).  Defendant Richman argues that Count III of the Complaint should be dismissed insofar as it asserts a private right of action under regulations 28 C.F.R. §§ 35.130(d) & 41.51(d).  We construe Title II of the ADA, § 504 of the RA, and their implementing regulations, together in light

---

[50] Wilder, 496 U.S. at 521.

[51] Harris, 442 F.3d at 463.

of their close similarity of language and purpose.[52]  28 C.F.R. §§ 35.130(d) & 41.51(d) direct states

to "administer services, programs, and activities in the most integrated setting appropriate to the needs

of qualified individuals with disabilities."   Plaintiff alleges that these regulations confer an

enforceable right to be provided with care in the most integrated setting.  Defendant argues, and we

agree, that these regulations are not enforceable; they merely require a public entity to administer its

programs and services to integrate disabled persons in an environment with disabled and non-disabled

persons where appropriate and possible.  These regulations both "focus on the person regulated rather

than individuals protected," and have an "aggregate focus," instead of an individual one.[53]  Pursuant

to the Third Circuit's ruling in Three Rivers, words that focus on the person regulated rather than the

individuals protected create "no implication of an intent to confer rights on a particular class of

persons," and therefore, create no enforceable right of action.[54]

          In Three Rivers, the Third Circuit invoked the reasoning of the Supreme Court from

Gonzaga University to affirm the district court's dismissal of a suit brought to enforce regulations of

the Department of Housing and Urban Development promulgated pursuant to Section 504 of the

RA.[55]  The Three Rivers Court ultimately found that the regulations at issue created rights that were

not personally enforceable either in a private cause of action or under § 1983.[56]  Specifically, the

Third Circuit held "although we assume that the HUD regulations properly effectuate Section 504,

---

[52] See, e.g., Helen L. v. DiDario, 46 F.3d 325, 330-32 (3d Cir. 1995).

[53] Three Rivers Ctr. for Indep. Living, Inc. v. Hous. Auth. of Pittsburgh, 382 F.3d 412, 429-30 (3d Cir. 2004).

[54] Id. at 429 (quoting Sandoval, 532 U.S. at 289) (internal citations omitted).

[55] Id. at 419-430.

[56] Id. at 431.

we cannot conclude that the regulations construe a personal right within Section 504.  As a result, plaintiffs cannot enforce the regulations by way of Section 504's private right of action."[57]  We reach the same conclusion here.  For the same reasons as in Three Rivers, we find that the regulations at issue here impose no enforceable obligation to provide services to each disabled individual in the most integrated setting.  Therefore, we will dismiss Count III of the Complaint as it relates to Plaintiff's attempt to enforce regulations 28 C.F.R.§§ 35.130(d) & 41.51(d).

## III.    CONCLUSION

For the foregoing reasons, the Court will grant the Board's Motion to Dismiss Counts I, II, and III against the Board Members in their respective individual capacities.  The court will deny Defendant Melmark's Motion to Dismiss Count IV of the Complaint.  Lastly, the Court will deny Defendant Richman's Motion to Dismiss Counts I and II of the Complaint, and grant Richman's Motion to Dismiss Count III of the Complaint with respect to the claims arising under regulations 28 C.F.R.§§ 35.130(d) & 41.51(d).

An appropriate Order follows.

---

[57] Id. at 430.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LEAH ZATUCHNI,** | ) | |
| *By her legal guardian,* | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION** |
| | ) | **No. 07-cv-4600** |
| **ESTELLE RICHMAN,** | ) | |
| *Secretary Pennsylvania Department of Public* | ) | |
| *Welfare, in her official capacity,* **et al.,** | ) | |
| **Defendants.** | ) | |

---

**ORDER**

**AND NOW**, this 12th day of August, 2008, upon consideration of Defendants Ellis, Matthews and Damsker's (the "Board's") Motion to Dismiss in Part [Doc. No. 5], Defendant Melmark's Motion to Dismiss [Doc. No. 6]; Defendant Richman's Motion to Dismiss [Doc. No. 23], and Plaintiff's respective Responses in Opposition [Doc. Nos. 16-19, 24 & 25], it is hereby **ORDERED** that Defendants Motions are **GRANTED** in part and **DENIED** in part, as follows:

1. Counts I and II of the Complaint are **DISMISSED** as to Defendants Ellis, Matthews and Damsker in their individual capacities;

2. Count III of the Complaint is **DISMISSED** as to Defendants Ellis, Matthews and Damsker in their individual capacities;

3. The Board's Motion to Dismiss Counts I, II and III of the Complaint is **DENIED** as to the claims against Defendants Ellis, Matthews and Damsker in their official capacities;

25

4.      Defendant Melmark's Motion to Dismiss Count IV of the Complaint is **DENIED**;

5.      Defendant Richman's Motion to Dismiss Counts I and II of the Complaint is

        **DENIED**; and

6.      Count III of the Complaint is **DISMISSED**, insofar as it seeks to enforce

        regulations 28 C.F.R. §§ 35.130(d) and 41.41(d).

        It is further **ORDERED** that Defendants shall file an answer to the remaining

claims in Plaintiff's Complaint [Doc. No. 1] within **twenty (20) days** of the date of this Order.

        It is so **ORDERED**.


                                        **BY THE COURT:**

                                        **/s/ Cynthia M. Rufe**

                                        _____

                                        **CYNTHIA M. RUFE, J.**